IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| *ex rel.* LASHAWN JONES, *et al.*, | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | |
| | * | Civil Action No. RDB-16-3056 |
| CONCERTED CARE GROUP, *et al.*, | | |
| | * | |
| Defendants. | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Relators Lashawn Jones and Latoya Godette filed this *qui tam* action on behalf of the United States and the State of Maryland under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the Maryland False Claims Act ("MDFCA"), Md. Code, Gen. Provision § 8-101 *et seq.*[1] Through the operative *qui tam*, Complaint Jones and Godette allege that Defendants Concerted Care Group, Noah Nordheimer, Alvin Nichols, and Barbara Wahl defrauded the United States Government by requesting Medicaid reimbursements for healthcare services they never provided. (Compl. ¶¶ 4, 177, 182, ECF No. 1.) Now pending is Defendants' Partial Motion to Dismiss Relator's Complaint pursuant to Fed. R. Civ. P. Rules 12(b)(6) and 9(b). (ECF No. 48.) The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021).

---

[1] As Judge Hollander of this Court has noted, the False Claims Act and Maryland False Claims Act "allow a private party, as relator, to sue on behalf of the government to recover damages against defendants who have caused fraudulent claims for payment to be submitted against the public fisc. As an incentive to bring such suits, a successful relator is entitled to share in the government's recovery from the defendants." *U.S. ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 842 (D. Md. 2013).

For the reasons set forth below, Defendants' Motion to Dismiss (ECF No. 48) is **DENIED IN PART** and **GRANTED IN PART.** Specifically, this Motion is **GRANTED** with respect to Noah Nordheimer and Alvin Nichols, and those individual defendants are dismissed from this action on all counts without prejudice. With respect to Concerted Care Group and Barbara Wahl, Defendants' Motion is **GRANTED** as to Counts I(a), I(c), I(d), I(e), and II(a), as Relators **CONSENT** to the dismissal of those counts. This Motion is **DENIED** with respect to Counts I(b) and II(b), the only counts which remain in dispute. These counts allege that Defendants knowingly "entered false information related to client services into its electronic medical records system to make it appear as if it had provided services when in fact it had not," (Compl. ¶ 186(b)), and "submitted claims for payment to Maryland Medicaid for services that were never provided," (*id.* ¶ 172(b)).

## BACKGROUND

A court ruling on a motion to dismiss "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). The following facts are derived from Relators' *qui tam* Complaint and accepted as true for the purpose of Defendants' motion to dismiss.

### I.  The Parties

Defendant Concerted Care Group ("CCG") is a drug addiction treatment and mental health services provider with core facilities located in Baltimore, Maryland. (Compl. ¶¶ 2, 25.) Defendants Noah Nordheimer, Alvin Nichols, and Barbara Wahl (collectively, the "Individual Defendants") were officers of CCG at all relevant times. (*Id.* ¶¶ 32, 38–39, 43.) Specifically,

Noah Nordheimer is the CEO and President of CCG, (*id.* ¶ 32), Alvin Nichols is the Executive Vice President of CCG, (*id.* ¶ 38), and Barbara Wahl is CCG's Business Operations Director, (*id.* ¶ 43). Nordheimer and Nichols "maintain[] significant, direct control over many of CCG's systems and processes, including matters related to Medicaid billing." (*Id.* ¶¶ 37, 40.) Moreover, Nichols and Wahl supervised Relator Jones directly and indirectly during various periods of her employment at CCG. (*Id.* ¶¶ 41, 47.)

Relators are two former employees of CCG. Lashawn Jones was a designated Health Home nurse for CCG between July 8, 2015, and October 23, 2015. (*Id.* ¶¶ 13–14.) Latoya Godette worked as a systems administrator for CCG between March 16, 2015, and November 3, 2015, and was responsible for designing the workflow CCG used to handle its patients' electronic medical records. (*Id.* ¶¶ 20–23.) Pursuant to the False Claims Act ("FCA"), Jones and Godette bring suit on behalf of the United States Government and the State of Maryland,[2] alleging that CCG and its officers defrauded the United States and the State of Maryland by falsifying patient records to obtain Maryland Medicaid reimbursement for services that they never provided. (*Id.* ¶¶ 4–5.)

## II.    Concerted Care's Participation in Health Home

In March 2015, CCG became a service provider for Maryland Medicaid's "Health Home" program, authorized by the Affordable Care Act and administered by the Maryland Department of Health and Mental Hygiene.[3] (*Id.* ¶¶ 3, 71.) Health Home provides support for

---

[2] Jones and Godette also brought suit on behalf of the State of Maryland. However, as the State of Maryland declined to join this case as a defendant, it is no longer a part of this action. (ECF No. 30.)

[3] Maryland Medicaid is administered by the Maryland Department of Health and Mental Hygiene, and jointly funded by the state and federal governments. (*Id.* ¶ 50.) The Health Home program was established in October 2013. (*Id.* ¶ 58.)

individuals with chronic conditions—such as "mental health, substance abuse, asthma, diabetes, heart disease and being overweight." (*Id.* ¶¶ 54–55.) To qualify for coverage under Health Home, individuals must have (i) two or more chronic conditions; (ii) one chronic condition and a risk of a second; or (iii) one serious and persistent mental health condition. (*Id.* ¶ 54.) To partake in Health Home and receive reimbursements, a provider must enroll as an accredited Medicaid provider in the State of Maryland, satisfy a mandatory service delivery threshold, and comply with certain statutory duties, such as minimum staffing levels and reporting requirements. (*Id.* ¶ 57, 60.)

In accordance with Health Home regulations, Health Home providers receive $ 98.87 from Medicaid for each client enrollment, and the same amount for each month of services provided to each client. (*Id.* ¶¶ 65–66.) To enroll a client in Health Home, a provider must provide an "initial assessment," requiring the provider to evaluate the participant's health and medical needs, and to request records from the participant's primary care physician and other providers. (*Id.* ¶ 64 (citing COMAR 10.09.33.06(B)(1)).) Once the client has been enrolled in the Health Home program, their provider must provide at least two health services per month, and document those services in eMedicaid. (*Id.* ¶ 68 (citing COMAR 10.09.33.07(B)(1)).) Eligible services include, *inter alia*, health care management, coordination with medical services, transitional care, patient and family support, referral to support services, status checks, education, health literacy, and addiction treatment. (*Id.* ¶¶ 56, 70, 120.); COMAR 10.09.33.06 (detailing all covered services).

Health Home providers are encouraged "to follow up with clients and their caregivers and to track the patients' broader health statistics." (Compl. ¶ 3.) For this purpose, CCG uses

an electronic notification system called Chesapeake Regional Information System for Our Patients ("CRISP") to maintain and track participant hospital encounter data. (*Id.* ¶ 61.) Additionally, patient data is entered into the eMedicaid health information system. (*Id.* ¶ 62.) According to an email incorporated into the Complaint, CCG clients are ordinarily enrolled in the Health Home program and entered into the patient databases for billing following their first day of service. (*Id.* ¶ 125.)

### III.    Discovery of Alleged Fraud

Relator Lashawn Jones began working for CCG as a Health Home nurse in July 2015. (*Id.* ¶¶ 13–14.) Lashawn Jones and Sade Oyekanmi were the only two CCG nurses assigned to Health Home. (*Id.* ¶ 73.) At the time Jones was hired, approximately 160 to 170 CCG clients were enrolled in Health Home. (*Id.* ¶¶ 74–75.) This number increased to 289 clients by the time Jones resigned. (*Id.* ¶ 99.) These clients were allegedly provided services by a single nurse in a single day: CCG's records indicate that all 170 clients were assisted by Oyekanmi on April 30, 2015. (*Id.* ¶¶ 77–78.) Oyekanmi reported that she was providing services for approximately 160 clients per month. (*Id.* ¶ 105–11.) However, Jones alleges that she witnessed Oyekanmi visit no more than 30 clients by the end of the third week. (*Id.* ¶ 112.)

Relators allege that CCG was attempting to maximize its Health Home enrollments, (*id.* ¶ 72), but was struggling to provide consistent services to its clients, who suffer from "drug addictions, behavioral health problems, and serious psychiatric disorders," and regularly fail to make appointments. (*Id.* ¶ 81.) Accordingly, the Individual Defendants pressured Jones to enroll additional clients in Health Home to obtain additional reimbursements. (*Id.* ¶¶ 89–90.) On August 31, 2015, Nordheimer sent an email to Nichols, Wahl, and Godette discussing the

importance of Health Home enrollments, and proposing that CCG offer $ 10.00 McDonalds gift cards in exchange for enrolling. (*Id.* ¶ 90.) On September 11, 2015, Nichols emailed Relator Godette and other employees, directing them to ensure that "all of these unpaid claims are cleaned up, processed, and remitted," and to discuss any "revenue impairments" that were "blocking or diminishing the billing process[]" for Health Home. (*Id.* ¶ 151–52.) In addition, Nordheimer and Wahl circulated spreadsheets of clients who were not enrolled in the program "as a way to push staff to enroll clients in the Health Home program." (*Id.* ¶¶ 92–93.)

Jones alleges that Wahl, who was responsible for day-to-day operations at the CCG offices in Baltimore, took aggressive steps to maximize Health Home enrollment and billing. (*Id.* ¶¶ 44–45, 107–16.) According to the Complaint, Wahl pressured Jones and Oyekanmi to falsify patient data in order to maximize client enrollments. (*E.g.*, *id.* ¶¶ 108, 114–17, 126–28.) Among other allegations, Jones claims that Wahl: (1) directed Jones to enroll five new clients per day and insisted that she could enroll clients without an in-person examination, (*id.* ¶¶ 94–95); (2) instructed both nurses to bill a Health Home service every time they reviewed a client's chart, (*id.* ¶ 107); (3) ordered both nurses to fill in missing services in the electronic medical records systems with "placeholders" in the patients' charts, (*id.* ¶¶ 108, 114–17, 157–61); and (4) instructed Jones to fill in missing data in the CRISP system during October 2015 to prepare for a Health Home audit, (*id.* ¶¶ 126–28).

Both nurses resigned in frustration: Oyekanmi resigned in September 2015, having only completed services for 49 of her 230 assigned clients in September, (*id.* ¶¶ 113–17), and Jones resigned in October, having completed only 50 client services that month, (*id.* ¶¶ 127–38, 142). Following Oyekanmi's departure, Jones was instructed "to add services to the client load of

230 people" before the end of the month, requiring her "to complete Health Home services for about 180 patients in the course of a week." (*Id.* ¶ 116.) CCG's drug counselors were assigned to this task—and one counselor claimed to have completed 50 to 60 client services in only a few hours by having clients certify that they had received health education while they were obtaining methadone at the pharmacy window. (*Id.* ¶¶ 117–18.) The Complaint alleges that several of these counselors complained "about Wahl pressuring them to enter services into the system that they did not provide." (*Id.* ¶ 161.)

According to the Complaint, Wahl responded to these resignations by hiring temporary workers to enter falsified services in each nurse's name. (*Id.* ¶¶ 132–36.) Relators contend that in September 2015, these temporary employees were instructed to enter data "about services allegedly completed by other CCG staff, including Jones and Oyekanmi, that had not actually been performed." (*Id.* ¶¶ 134, 156.) Relators assert that "Jones had not performed the services that the temporary employee entered, and this temporary employee had not performed any services," nor were they licensed to do so. (*Id.* ¶ 136.) They further allege that, following Jones's resignation, Wahl logged into CCG's databases using Jones's and Oyekanmi's credentials to enter additional services in both nurses' names. (*Id.* ¶¶ 126–28, 143–45.) CCG's November client census, incorporated into the Complaint, shows that 284 Health Home clients were assigned to Jones and Oyekanmi through November 2, 2015—well after both nurses had resigned. (*Id.* ¶ 164.)

Godette claims to have discovered Wahl's fraud in real-time as she monitored CCG's electronic notification system. (*Id.* ¶¶ 135–40.) Godette claims Wahl asked her to automate the inclusion of certain client entries, that she witnessed Wahl add services in both nurses' names

after their resignations, backdating these data to create a misleading impression that both nurses had completed the corresponding client services prior to their resignations. (*Id.* ¶¶ 109, 135, 137–43.) She further claims that, during a review of CCG's patient database, she saw that CCG had billed 290 services in October 2015, when Jones had only completed 50 services prior to her resignation that month. (*Id.* ¶¶ 143–47.) Godette was terminated in November 2015 without notice, shortly after discovering the putative fraud. (*Id.* ¶ 165.)

## IV.    Procedural Posture and Narrowing of the Issues

Jones and Godette filed this *qui tam* action on behalf of the United States and the State of Maryland under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the Maryland False Claims Act ("MDFCA"), Md. Code, Gen. Provision § 8-101 *et seq.* In the operative *qui tam* Complaint, Relators invoke two substantive FCA clauses: The "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), and the "false records" provision, 31 U.S.C. § 3729(a)(1)(B). They further allege that Godette was terminated in violation of the FCA's antiretaliation clause. Through the instant motion, Defendants seek to dismiss only the two substantive claims.

The False Claims Act presentment provision, 31 U.S.C. § 3729(a)(1), authorizes a *qui tam* action against any individual who "knowingly presents, or causes to be presented [to the Government], a false or fraudulent claim for payment or approval." In Count I of the operative complaint, Relators allege that Defendants violated this statute by knowingly:

(a) [Shifting] all CCG clients to the Medicaid Health Home Program to bill additional fees to Medicaid without conducting an intake process sufficient to determine whether clients were eligible for the Health Home program;

(b) [Submitting] claims for payment to Maryland Medicaid for services that were never provided;

(c) [Billing] the government for services that do not qualify for payment under the Health Home program;

(d) [Billing] for services provided to clients who were not properly enrolled in the Health Home program; and

(e) [Failing] to maintain the proper staffing requirements under the applicable Health Home regulations.

(Compl. ¶ 177.) Relators consent to the dismissal of Counts I(a), (c), (d), (e). (Resp. Opp. 2, ECF No. 52.) Accordingly, these Counts shall be dismissed with prejudice. The only contested Count is I(b), which alleges that the Defendants "submitted claims for payment to Maryland Medicaid for services that were never provided." (Compl. ¶ 177(b).)

The False Claims Act "false records" provision, 31 U.S.C. § 3729(a)(2), provides a *qui tam* action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]" In Count II of the operative Complaint, Relators allege that Defendants violated this provision by knowingly:

(a) [Completing] enrollment forms for the Health Home program without clients' knowledge and working face-to-face with clients to clarify rights and responsibilities under the Health Home program; and

(b) [Entering] false information related to client services into its electronic medical records system to make it appear as if it had provided services when in fact it had not.

(Compl. ¶ 182.) Once more, Relators consent to the dismissal of Count II(a). (Resp. Opp. 2.) Accordingly, this Count shall be dismissed with prejudice. The only contested Count is II(b), which alleges that the Defendants "entered false information related to client services into its electronic medical records system to make it appear as if it had provided services when in fact it had not." (Compl. ¶ 182(b).)

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Rule 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotations omitted).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

Claims grounded in fraud are subject to a heightened pleading standard. Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud be stated with particularity." Fed. R. Civ. P. 9(b). Rule 9(b) "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991). To satisfy the rule, a plaintiff must "identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments." *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007). "A 'complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud.'" *Kimberlin v. Hunton & Williams LLP*, No. GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mar. 29, 2016) (citing *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000)).

## ANALYSIS

Relators bring claims against Defendants under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and Maryland False Claims Act ("MDFCA"), Md. Code, Gen. Provision § 8-101 *et seq.* These statutes allow private individuals, known as *qui tam* relators, to bring private actions against "a defendant who has caused fraudulent claims for payment to be submitted against the public." *United States ex rel. Maharaj v. Estate of Zimmerman*, 427 F. Supp. 3d 625, 633 n.1 (D. Md. 2019); *accord United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) ("In adopting the FCA, 'the objective of Congress was broadly to protect the funds and property of the government.'" (quoting

*Rainwater v. United States*, 356 U.S. 590, 592 (1958)). In pertinent part, the False Claims Act

provides a cause of action against an individual who:

> (1) knowingly presents, or causes to be presented [to the Government], a false
> or fraudulent claim for payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the
> Government[.]

*Harrison v. Westinghouse Savannah River Co.* ("*Harrison I*"), 176 F.3d 776, 784 (4th Cir. 1999)

(quoting 31 U.S.C. § 3729(a)).

Given the "essentially punitive"[4] nature of the damages available in False Claims Act

cases, "[t]he Supreme Court has cautioned that the False Claims Act was not designed to

punish every type of fraud committed upon the government." *Id.* at 785. The Act "imposes

liability not for defrauding the government generally; it instead only prohibits a narrow species

of fraudulent activity: 'present[ing], or caus[ing] to be presented . . . a false or fraudulent claim

for payment or approval.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504

(6th Cir.2007) (citation omitted) (alterations in original); *see also Harrison I*, 176 F.3d at 785

("[T]he statute attaches liability, not to the underlying fraudulent activity or to the

government's wrongful payment, but to the 'claim for payment.'" (citation omitted) (alteration

in original)). Accordingly, to state a claim under the False Claims Act, a relator must plead:

"(1) that the defendant made a false statement or engaged in a fraudulent course of conduct;

(2) such statement or conduct was made or carried out with the requisite scienter; (3) the

---

[4] *Vermont Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 784, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ("[T]he current version of the FCA imposes damages that are essentially punitive in nature . . . ."); *see also Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 734 (10th Cir.2006) (Hartz, J., concurring) ("[T]he False Claims Act is a punitive statute ....").

statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due [on a claim to the Government]." *United States ex rel. Harrison v. Westinghouse Savannah River Co.* ("*Harrison II*"), 352 F.3d 908, 913 (4th Cir. 2003); *accord United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014).

As a result of Relators' narrowing of the Complaint, the instant False Claims Act claims now turn squarely on whether they have pled that CCG and its officers knowingly "entered false information related to client services into its electronic medical records system to make it appear as if it had provided services when in fact it had not," and "submitted claims for payment to Maryland Medicaid for services that were never provided." (Compl. ¶¶ 172(b), 186(b).) Defendants do not contend that Relators failed to plead scienter, which may be alleged generally. Fed. R. Civ. P. Rule 9(b); *accord Harrison I*, 176 F.3d at 784 ("The second sentence of Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive."). Instead, Defendants contest all remaining elements, claiming Relators fail to plead with particularity: (1) the creation of false records; (2) the presentment of fraudulent claims; or (3) the materiality of the putative fraud. (Mem. Supp. 11, 20, 25, ECF No. 48-2.) They further insist Relators fail to plead each Individual Defendant's involvement in the putative fraudulent conduct. (*Id.* at 26.)

## I.    Fraudulent Statements

"To satisfy [the] first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Accordingly, a relator must rely on more than "mere 'allegations of poor and inefficient management of contractual duties,'" *id.* at 377 (quoting *Harrison I*, 176

13

F.3d at 789), or "honest mistakes or incorrect claims submitted through mere negligence," *Owens*, 612 F.3d at 728 (quoting *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998)), to state a claim on this prong. "Likewise, 'imprecise statements or differences in interpretation growing out of a disputed legal question'" do not constitute falsehood. *Wilson*, 525 F.3d at 377 (quoting *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)). Instead, a relator must plead knowing fraudulent conduct with particularity. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015).

Defendants contend that Relators set forth "a litany of vague, conclusory allegations about a purported scheme that could possibly facilitate fraud" without any supporting details to suggest "that Defendants actually created any false records or made any false statements that were material to a false claim presented to the U.S. Government." (Repl. Supp. 7, ECF No. 53.) In support of this assertion, Defendants assert that Relators "chiefly rely" on their allegation that "Wahl sent an email instructing Godette to alter enrollment dates to allow CCG to bill for services performed before the client was enrolled in Health Home." (Compl. ¶ 125.) According to Defendants, the original email was sent by Elizabeth Said, rather than Barbara Wahl—and far from demonstrating a fraudulent scheme, this email sought only to correct a technical issue in CCG's billing system that created the appearance that clients were being enrolled after services were provided. (Repl. Supp. 6.)

Relators do not rest their FCA claims on a singular email. Rather, they set forth multiple allegations to establish a pattern of submitting false claims for services CCG never provided. (Compl. ¶¶ 134, 137–45.) This allegation is not conclusory. In addition to the foregoing email, Relators allege that: (1) CCG entered services for 290 Health Home clients in October 2015,

14

when Jones had completed 50 services prior to her resignation, (*id.* ¶ 143–47); (2) Godette saw Wahl log into the patient database using Jones's credentials and backdate patient services in Jones's name after Jones resigned in October, (*id.* ¶¶ 109, 135, 137–43); (3) Wahl ordered CCG staff, including the relators, to enter placeholder data into the patients' charts to cover up deficiencies in advance of an audit, (*id.* ¶ 108, 158–60); (4) Wahl hired temporary workers to enter data in both nurses' names reflecting services that they never provided, (*id.* ¶¶ 132–36); and (5) CCG's database purports that Oyekanmi impossibly provided services to all 160 to 170 CCG clients on April 30, 2015, (*id.* at ¶¶ 77–78). These claims, pled with particularity and construed in the light most favorable to Relators, are sufficient to allege that CCG entered objectively false information into its patient records.

## II.    Presentation of False Claims

"In order for a false statement to be actionable under either subsection of the FCA, it must be made as part of a false or fraudulent claim." *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018). Accordingly, "a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government.'" *Harrison I*, 176 F.3d at 785.[5] As the United States Court of Appeals for the Fourth Circuit noted in *Grant*, "there are two ways to adequately plead presentment under Rule 9(b):"

> First, a plaintiff can 'allege with particularity that specific false claims actually were presented to the government for payment.' This standard requires the plaintiff to, 'at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the

---

[5] There is a distinction between Relators' § 3729(a)(1)(A) "presentment" claim, and Relators' § 3729(a)(1)(B) "false record" claim: The former requires that the defendant itself present a false claim, or cause such a claim to be presented, while the latter requires that a defendant make or use a false record that is material to such a claim. *See Grant*, 912 F.3d at 199–200. This difference is nonetheless immaterial for present purposes, as in either case, "a plaintiff asserting an FCA claim is still required to show that a false claim was submitted to the government." *Id.* at 200.

misrepresentation and what he obtained thereby.' [Second], a plaintiff can allege a pattern of conduct that would '*necessarily* have led[] to submission of false claims' to the government for payment.

912 F.3d at 197 (quoting *Harrison I*, 176 F.3d at 784; *Wilson*, 525 F.3d at 379) (emphasis in original). Defendants insist that Relators fail to satisfy this element, as they do not list "specific false claims" that were presented to the Government. (Mem. Supp. 11.) However, that is not the only path forward: Relators may also allege the existence of a pattern of conduct that would necessarily result in the submission of fraudulent claims. *Grant*, 912 F.3d at 197. They have done so here.

A relator may satisfy this prong with "specific allegations of the defendant's fraudulent conduct [that] necessarily [lead] to the plausible inference that false claims were presented to the government." *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013). In *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), cited in *Nathan*, the relator alleged that two high-ranking hospital employees were delegating patient interactions to nurses, while billing every day as a "face-to-face" patient visit that had not actually occurred. 563 F.3d at 184. Although the relator did not specifically allege the "exact dollar amounts, billing numbers, or dates" of any false claims, the United States Court of Appeals for the Fifth Circuit held that the relator's allegations were sufficient to state an FCA claim. *Id.* at 189–90. The relator had pled "the existence of a billing scheme" and offered "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. The Fifth Circuit found it implausible that doctors would "continually record unprovided services only for the scheme

to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." *Id.* at 192; *accord Nathan*, 707 F.3d at 457.

Comparatively, "merely alleging fraudulent conduct and an umbrella payment, without more, is insufficient." *Grant*, 912 F.3d at 198. In *Grant v. United Airlines*, 912 F.3d 190 (4th Cir. 2018), a relator alleged that the defendant airline company had "certified that work had been completed even when it had not"—specifically, by writing off various aircraft repairs that had not been performed, using uncalibrated and uncertified tools, and covering up maintenance concerns. 912 F.3d at 194–95. Although this fraud was related to a $11.75 billion contract between United and Boeing, the United States Court of Appeals for the Fourth Circuit concluded that these allegations were insufficient to state an FCA claim. *Id.* at 195. The Fourth Circuit found decisive the relator's failure to allege "how, or even whether, the bills for these fraudulent services were presented to the government and how or even whether the government paid United for the services." *Id.* at 198. As relators nowhere described United's billing structure, and nowhere alleged that all fraudulent entries were submitted to the government, the court could not infer "that United's conduct would have *necessarily* led to a false claim being submitted to the government for payment." *Id.* at 198.

The facts in this case hew closer to *Grubbs* than to *Grant*: Relators provide enough details of CCG's billing pipeline to suggest that the alleged fraud would necessarily lead to the submission of false claims. Relators claim CCG "inputs information regarding participants' services" into eMedicaid for "enrollment, reporting, and tracking." (Compl. ¶¶ 59, 62.) They further allege that CCG and its officers entered false information into its databases "for Health Home services that [they] had never actually performed." (*See id.* ¶¶ 132–38, 141–45.)

Moreover, as noted above, they set forth several "reliable indicia" supporting this claim—such as claims submitted in the names of nurses who had resigned, an improbable number of claims submitted by a single nurse in a single day, the assignment of clients to nurses who had already resigned, and the use of "placeholders" to fill empty database entries. (*E.g.*, *id.* ¶¶ 77–80, 132–47, 158–60.) Accepted as true, these allegations "necessarily [lead] to the plausible inference that false claims were presented to the government." *Nathan*, 707 F.3d at 457. As in *Grubbs*, it would "stretch the imagination" to conclude that CCG and its staff "continually record unprovided services only . . . to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." 563 F.3d at 192. Accordingly, Relators have plausibly pled the presentation of fraudulent claims for payment to the Government.[6]

## III.    Materiality

"Under the FCA, a false statement or misrepresentation in a claim submitted to the Government may only form the basis of an FCA claim if it was 'material to the Government's payment decision.'" *Graham v. Honeywell Int'l, Inc.*, No. TDC-21-0310, 2021 WL 5304216, at *4 (D. Md. Nov. 12, 2021) (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181, 192 (2016)). "The materiality standard is demanding." *Universal Health*, 579 U.S. at 194.

---

[6] Defendants argue that many of the alleged fraudulent incidents occurred before or after Relators were employed by CCG. (*See* Mem. Supp. 17 ("Relators' own allegations establish that they have little to no personal knowledge about the submission of false claims to any government entity.").) Chiefly, CCG argues that Relator Jones' allegations regarding services documented by CCG in April and November 2015—before and after her employment, which stretched from June to October—are impermissibly speculative. (*Id.*) This argument overlooks the fact that the allegations in question rely on CCG's database, and are buttressed by observations made by Relator Godette, whose employment encompassed the relevant time period. More fundamentally, adjudicating issues of reliability at this early stage belies this Court's obligation to construe all allegations in the light most favorable to the relators.

Accordingly, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* Rather, the materiality of a false statement or conduct "turns on 'whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States ex rel. Berge v. Bd. of Tr. of Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997) (quoting *United States v. Norris*, 759 F.2d 1116, 1122 (4th Cir. 1984)). This element does not look to whether the false statements actually influenced agency action, but whether those statements are "capable of influencing the Government's decision to pay." *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017).

CCG argues that Relators offer only "a mere recitation of the legal standard" that fails to meet this "rigorous" requirement. (Mem. Supp. 25–26.) Defendants insist that Relators claim the putative fraud was "material to Maryland Medicaid's decision to pay Health Home claims," (Compl. ¶¶ 178, 183), but fail to explain *how* the putative fraud was material to any payment, (Mem. Supp. 25, Repl. Supp. 8).

CCG's sole authority in support of this argument is *United States ex rel. Potter v. CASA de Md.*, Civ. No. PX-16-0475, 2018 WL 1183659 (D. Md. Mar. 6, 2018), in which the relator argued that CASA, a Latino and immigrant advocacy organization funded by the Department of Education, had violated the FCA by falsifying employees' I-9 forms in advance of an audit. 2018 WL 1183659, at *2. Although the audit was not expressly predicated on I-9 compliance, it required CASA to certify that it was "managing Federal awards in compliance with laws, regulations, and the provisions of contracts or grant agreements." *Id.* at *1. CASA moved to dismiss, challenging the falsity and materiality prongs, and this Court granted that motion. *Id.*

at **1, 4. As relevant, this Court found that the relators had merely alleged, "in conclusory fashion, that CASA would not have received federal funds if the government knew about the I-9 deficiencies," and failed to "include any facts showing that the sufficiency of CASA's employees' I-9s related at all to the decision to grant CASA government funding." *Id.* at *6. Absent any evidence as to "*how* CASA's failure to disclose its I-9 noncompliance would have influenced the government's funding decisions," the relator had not pled materiality. *Id.*

This case is nothing like *Potter*. In *Potter*, the relators rested their FCA claims on the defendant's noncompliance with I-9 requirements—an ancillary obligation lacking any clear connection to the Government's payment decision. Comparatively, it is difficult to conceive how the fraud alleged in this case could *not* be material to reimbursement under Health Home. Pursuant to the Complaint, Health Home providers receive $ 98.87 in Medicaid payments for each month of services that they provide to enrolled patients. (Compl. ¶¶ 65–66.) Providers must complete at least two services per month to receive these reimbursements. (*Id.* ¶ 68.) Relators do not allege that CCG concealed its noncompliance with an ancillary term required to receive these payments—they allege that CCG fraudulently claimed that services were provided in the first instance, with the specific objective of "influencing the Government's decision to pay," (*see id.* ¶¶ 177, 182); *Triple Canopy*, 857 F.3d at 177. There is no serious question that the Government would not have paid for services that were never provided at all. *Cf. United States v. Triple Canopy, Inc.*, 857 F.3d 174, 176 (4th Cir. 2017) ("[C]ommon sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot straight." (alteration in original) (citation omitted)).

Accordingly, Relators have adequately pled the materiality element of FCA liability, and Defendants' Motion to Dismiss is **DENIED** as to Defendant Concerted Care Group.

## IV.    Liability of Individual Defendants

Notwithstanding the above, CCG argues that Relators have not pled facts by which the Individual Defendants may be held liable under the False Claims Act. As other district courts have observed, "[i]ndividual liability under the FCA must be pled with specificity and cannot be based exclusively on inserting the words 'individual capacity' into the complaint." *United States ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*, 224 F. Supp. 2d 1042, 1049–50 (W.D. N.C. 2002); *see also United States v. Cherokee Implement Co.*, 216 F. Supp. 374, 376 (N.D. Iowa 1963) ("[I]n order for the individual to be liable, he must have been part of the cause which resulted in the false claim."). Defendants contend that Relators "do not allege any conduct, fraudulent or otherwise, engaged in by the individual defendants," who are "entirely absent from the substantive allegations of the Complaint." (Mem. Supp. 26, 28.)

As to Defendant Wahl, CCG's argument fails. "Relators' Complaint alleges multiple facts that [suggest] Wahl was directly responsible for entering false information or for instructing others to enter false information, and for overseeing the billing of claims for services not performed to Medicaid." (Resp. Opp. 12.) Relators allege that Wahl, as CCG's Business Operations Director, was responsible for day-to-day operations at CCG's Baltimore office, (Compl. ¶¶ 42–47), and supervised Jones directly during her tenure as a Health Home nurse, (*id.* ¶¶ 41, 43). Relators offer several allegations in support of their assertion that Wahl expressly pressured nurses, counselors, and the Relators "to enter services into the system that they did not provide." (*Id.* ¶ 161.) Relators allege that Wahl directed the nurses to enter

"placeholders" into patients' charts to cover up empty entries in advance of an audit, (*id.* ¶¶ 107–16, 126–28), hired temporary workers to complete this task when Oyekanmi and Jones resigned in protest, (*id.* ¶¶ 126–28), and personally logged into CCG's database using Jones's login credentials to add backdated services in Jones's name, (*id.* ¶¶ 137–40). These allegations, set forth with particularity, are sufficient to plead Wahl's involvement in the putative fraud. Accordingly, Defendants' Motion to Dismiss is hereby **DENIED** as to Defendant Wahl.

As to Defendants Nichols and Nordheimer, Relators fail to state an FCA claim. The Complaint alleges that these Defendants maintain "significant, direct control over many of CCG's systems and processes, including matters related to Medicaid billing and revenue cycle management." (*Id.* ¶¶ 37, 40.) Relators claim Nordheimer circulated a spreadsheet of patients to prioritize for enrollment, and "exerted pressure on nursing staff, including Jones, to ensure that CCG could seek reimbursement from the Health Home program for all of CCG's patients." (Resp. Opp. 11; *e.g.*, Compl. ¶¶ 90–93.) They also allege that Nichols was Jones's supervisor for some time, and sent an email addressing issues "blocking or diminishing" reimbursements. (Compl. ¶¶ 41, 151–52.) Although these allegations suggest that these two Individual Defendants took active steps to increase Health Home enrollment numbers, they do not indicate that either Nichols or Nordheimer participated in the creation of false records or the presentation of false claims.[7] Accordingly, Defendants' Motion to Dismiss is hereby

---

[7] Relators insist that, as officers with control over CCG's general activities, Nichols and Nordheimer "had knowledge of the process by which the program was executed and billed." (Resp. Opp. 12.) Even assuming these allegations were sufficient to plead awareness of ongoing fraud, *see United States ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 912 F.3d 731, 735 (4th Cir. 2019), Relators fail to allege that these individual defendants either "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment" or "knowingly [made], use[d], or cause[d] to be made or used, a false record or statement." 31 U.S.C. § 3729(a). As fraud must be pled with particularity, this Court cannot infer that Nichols and Nordheimer may have been involved in the alleged fraud based on their supervisory authority alone.

**GRANTED** as to Defendants Alvin Nichols and Noah Nordheimer. Those Defendants are dismissed from this action without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 48) is hereby **GRANTED IN PART** and **DENIED IN PART.** Specifically, this Motion is granted with respect to Defendants Noah Nordheimer and Alvin Nichols, and those individual defendants are dismissed from this action on all counts without prejudice. With respect to Defendants Concerted Care Group and Barbara Wahl, Defendants' Motion is **GRANTED** as to Counts I(a), I(c), I(d), I(e), and II(a), as the Relators **CONSENT** to the dismissal of those Counts. Defendants' Motion is **DENIED** with respect to Counts I(b) and II(b). This case shall proceed only on Counts I(b) and II(b).

A separate order follows.


Date: March 23, 2022                                      _____/s/_____
                                                          Richard D. Bennett
                                                          United States Senior District Judge